Good morning, Your Honors. May it please the Court, Robert G. Ryan for the Petitioners. I'd like to reserve two minutes for rebuttal. The main issue as we see it in this case today is whether the substantial evidence in this record compels the conclusion that no reasonable adjudicator would have denied withholding a removal under the INA or the Convention Against Torture. In particular, we are requesting that this Court extend its recent decision in Sale v. Ashcroft to the Petitioners' separate withholding of removal applications. As Your Honors know, the Sale Court specifically left open the issue of whether that decision would apply to withholding a removal or cat relief. The Sale Court noted, of course, that because the Petitioner in that case did not pursue those alternative forms of relief on appeal, those applications were not before the Court. And also, in the Sale decision, the VIJ had granted asylum and for that reason did not reach the applications for withholding a removal or cat relief. In brief, as this Court well knows and has been stated already this morning, Sale holds that given Indonesia's history of anti-Chinese violence and official discrimination, Indonesia's ethnic Chinese minority is at least a disfavored group. The Court, of course, then held that because the record establishes that ethnic Chinese are significantly disfavored in Indonesia, the Petitioner there was required to demonstrate a comparatively low level of wanted to prove that she has a well-founded fear of future persecution. And the Court also required that membership in the disfavored group must be coupled with a showing that the applicant is likely to be targeted as a member of that group. And the Sale Court concluded that Ms. Sale had met this burden with evidence of past threats and violence. We also note that the IJ in Sale did not find that Sale's experiences amounted to past persecution. And we note that Sale was not physically harmed. So today, in this case, we're requesting that this Court apply Sale's comparatively low level of individualized risk test to reduce the usual clear probability of persecution standard in withholding cases to one that approximates the asylum standard of establishing a well-founded fear of future persecution. Now, with respect to the lead Petitioner, Emil Yosef, he is a 53-year-old ethnic Chinese Catholic. He was born in Jakarta, Indonesia. He claims the protected grounds of his Chinese ethnicity, his Catholic religion. He testified that he's a Catholic on page 91 of the record. Membership in a particular social group, that is, ethnic Chinese Christian men who are married to ethnic Indonesian Muslim women and imputed political opinion based on his Chinese ethnicity, his religion, and his mixed marriage to a native Indonesian Muslim woman. The record shows that he suffered discrimination, harassment, and the threat of violence based on an attack on his business by native Indonesians because of his Chinese ethnicity. The record also shows that native Indonesians attacked similarly situated ethnic Chinese persons, that is, two of his employees. In particular, Mr. Yosef testified and stated in his declaration that in August 1997, he and his construction business were severely affected during an anti-Chinese riot. He testified that two of his employees, an ethnic Chinese driver and his assistant, were involved in a melee following an automobile accident that was caused by someone else. The driver and his ethnic Chinese assistant were pulled from the truck and both were beaten by native Indonesians. I would like to clarify one point in the record. His declaration states that there were three employees and his testimony was that there were two employees. Mr. Yosef also testified that the next day, native Indonesians stoned and ransacked his store and that his other vehicles were vandalized, including one at his place of business, which was adjacent to his home about 15 meters from the store. He testified that the native Indonesian mob came through and started yelling, kill Chinese, kill Chinese. And that's the record at page 141. Also, the judge so found it at page 60. He testified that he reported the damage to the police, but they did nothing. Now, at this point, I want to clarify the record again. We note that the IJ found that, and I quote, he and other members of his family ran out the back door and his family took refuge elsewhere outside the house, unquote. That's at 61. In fact, Mr. Yosef stated in his declaration that he and his son, Rifki, who was not in this case, it was with Rifki at the time of the attack, and that after the attack, quote, I, Ellipsis, left the house with my family, Ellipsis, end quote, and they went to Karawang. That's at administrative record 556, page three of the declaration. Excuse me. After reviewing the record, including the testimony of the other petitioners, his entire family was not present at the attack. We just want to clarify that. Although Mr. Yosef did testify that he met them the next day in Jakarta, and that the family members were staying in Karawang. That's at the record 142 and 143. Mr. Yosef also testified about an attack in 1996 by Native Indonesians on his daughter, Dalia, which included an attempted rape. Dalia was a part of this case at the The IJ did not make an express credibility finding regarding the testimony of the petitioners, so credibility, of course, is presumed in the circuit under Conjura Flores v. INS. The IJ did state that, quote, they may have a subjective fear of persecution, unquote. That's 66 in the record. We believe that the weight of the evidence is that they do indeed have a subjective fear. With respect to Mr. Yosef's wife, Lili Darliana, she is a 45-year-old Indonesian citizen. She is a native or ethnic Indonesian and a Muslim. She testified that she fears persecution because of her ethnic Chinese appearance, her mixed marriage to the ethnic Chinese lead petitioner, and the ethnically mixed, as she put it, trapped to her children, unquote, at the record at page 180. So her claims are based on the protected grounds of ethnicity, religion, imputed political opinion based on her mixed marriage and the ethnically mixed children, and membership in a particular social group, that is, Native Indonesian women married to ethnic Chinese Christian men who are at greater risk of persecution than the general population. With respect to their son, Ali Yosef, he is a 16-year-old Indonesian citizen. He is half ethnic Chinese and half Indonesian. He testified that he has a Chinese appearance, and at school and in his neighborhood he was often called a, quote, stupid Chinese, unquote. That's at pages 201 and 202 of the record. He claims the protected grounds of ethnicity and imputed political opinion. Their daughter, Cynthia Yosef, is 11 years old, and she, of course, is also an Indonesian citizen. She is also half ethnic Chinese and half Indonesian, and she was only four years old when she entered the United States in 1997. She testified that she's afraid to return to Indonesia because, quote, maybe they're going to hurt me and stuff and might kill me, unquote. She also claims the protected grounds of ethnicity and imputed political opinion. And we note that the record in SAIL shows that Tati SAIL was part ethnic Chinese and part ethnic Indonesian. That's Westlaw, page one. And it was undisputed on that record that she has an ethnic Chinese appearance. With respect to country conditions, there's a lot in the record. Suffice it to add, for the ethnic Chinese, there is official state-sanctioned discrimination against the ethnic Chinese. With respect to religion, the 2001 religion report talks about the fact that the government cannot seem to control the violence in that respect as well. I'll just save the rest for a moment. Thank you. May it please the Court. Dimple Gupta from the Department of Justice on behalf of the Respondent, Attorney General John Ashcroft. Your Honors, in light of SAIL, I think the question before this Court for the lead Petitioner is, given that he is a member of a disfavored group, and given the facts of this case, does it compel the conclusion that he is more likely than not to suffer persecution if he returns to Indonesia? Now, this Court has quite the point that he will suffer it, that he fears that he will suffer it. Right. Well, the standard is, yeah, is he more likely than not to have an objective fear for suffering persecution? You know, this Court has addressed this question before, well, not in SAIL, which only addressed asylum, which isn't at issue. It did squarely address this issue in HOXA. That's H-O-X-H-A. It's at page 32 of the government's brief. There the Court found that the Petitioner, who is an Albanian in Kosovo, was a member of a disfavored group. In fact, the Court and the IJ and BIA before it had gone a step further, the Petitioner submitted credible evidence that 20-something-year-old Albanian men were specifically targeted among all the men, among all Albanians. The Court addressed that and addressed the facts of that case and found that they did not warrant a finding of withholding. Now, if we look at the facts in HOXA, we see that they're far more severe and far more severe. The Petitioner was specifically singled out, taken, and beaten. He suffered two cracked ribs and facial injuries. None of the Petitioners here were physically injured, and none of them were specifically targeted on a face-to-face individual basis. Also, that Petitioner suffered a lifetime of insults and threats, including, again, face-to-face death threats where he was told he had better leave the country. And lastly, for that Petitioner, the officials in the country specifically summoned him for questioning, and he submitted credible evidence that that was often just sort of a ruse to interrogate and beat citizens of Albanian descent. He ignored that summons, which led to the inference that the officials would have identified him and would be looking for him. Now, the Court looked at all this evidence, plus the fact that he was a member of a disfavored group, and plus the fact that he was a particularly high-risk member of that disfavored group, and held that it didn't satisfy the standards for withholding. Now, given that, I don't think the facts of this case would warrant a finding of withholding either. Here, the lead Petitioner has submitted that he's a member of a disfavored group. He's not pointed out that he's specifically a submember, especially a high-risk subgroup. And if we look at the incidents he's pointed out, none of them are individualized towards him. The first one involved two of his employees who got caught up in a general riot in 1997. He never testified, and there's absolutely no evidence in the record that during the riot the people who targeted his employees knew that those employees worked for him, were affiliated with him, or were the Yusoff family. Now, what do you make of the fact that his business was destroyed? Right. I think what happened there, from my understanding of the record and his testimony, is during the riot, the rioters in general went out and started to destroy cars and businesses. Now, it's not entirely clear whether they ---- But just in general, that was very specific. Right. No. And they were yelling, kill Chinese, and they did also target Chinese businesses, it seems, more than other businesses. They did target his store, and they did destroy it. Right. But it's not ---- There's no evidence in the record that shows that they knew that this was Mr. Yusoff's store, that it was because he was there. The evidence is just they thought it was a Chinese store, and so any Chinese man who owned that store, any Chinese store was targeted. You're not going to ---- It's going to be very rare to find that kind of evidence because people who are destroying stores don't usually leave a calling card saying, you know, I'm a rioter, and I'm discriminating against you within the meaning of the INA, and I intend this to be persecution. That doesn't happen. No, no. I'm just trying to argue that ---- Are you going to move on to his claim for asylum? Oh, his claim for asylum, first of all, the IJ found that it was time barred, and the Petitioner here has an appeal about findings, so I don't think it's before the Court. The only thing that's before this Court is withholding in Katz, because it was in brief to this Court by Petitioner or raised in the briefs or at oral argument, and because the IJ found it was time barred, it's not here. But you ---- Withholding, there's no time bar to that. Right. So, no, withholding is before the Court. Right. And I think that in Hoekse, when we had a series, a lifetime of individualized threats and harassment, you know, he was specifically ---- he was with one other friend, and the two of them were identified and taken and beaten specifically. And then he was specifically summoned. I mean, if those series of individualized threats, then I think the one argument that Petitioner has here, that his business was stoned, even if this Court were to find it was individualized ---- Well, it wasn't just stoned. It was destroyed. Destroyed. Right. Destroyed. Yeah, with stones. I'm sorry. Even if this Court were to find that constituted an individualized threat, it's simply not under the rule of Hoekse enough to reach the withholding standard. And I think this Court doesn't need to look beyond the Hoekse decision for that. I mean, here the instance just ---- Is there a finding of pattern and practice in Hoekse? Was there a finding of what? I'm sorry. Pattern and practice. The Court didn't address the pattern and practice issue. Now, if we were to find pattern and practice here and find that this Petitioner is a member of the disfavored group, isn't that the end of the story? I think that would be correct, Your Honor. But I think that there's ample evidence in this record, evidence that the IJ specifically highlighted, to show there isn't a pattern or practice. The daughter, Dahlia, who claimed that she was raped, the first point to notice is that she voluntarily returned to Indonesia of her own accord, and she's lived there for several years without any incidents. I think that still lies the idea of a pattern or practice. Also, the Petitioner's own declaration indicated that when the event happened, when there was the attempted rape, that initially the suspects fled, but the police later apprehended them. The police wanted to press charges and were ready to go forward. But Dahlia, being afraid and being reluctant, didn't want to. I think that also undercuts the pattern or practice finding, Your Honor. If there is evidence that the Petitioner submitted, not us, that the police are actively investigating wrongdoings against Indonesians for this family and for this case, I don't think a pattern or practice is warranted here. And lastly, there isn't any other evidence other than this one riot where many Chinese were targeted, and there was a lot of destruction. The Petitioner's business was ever attacked again after it or before it. Or any member of Petitioner's family was ever targeted before or after. What's the time sequence here? He didn't try to reestablish his business, did he? Your Honor, my understanding is that some of his cars were damaged, I think, beyond use. Some weren't. And his business was harmed, and he decided not to go forward with it. But, you know, I think to establish a pattern or practice, his house was never harmed that we know of. You know, his family was never harmed again. A pattern or practice is a very, very high threshold that this Court reserves for things akin to Nazi Germany, where every member of a group is systematically rounded up for torture, detention, extermination, or some incredibly harsh treatment. I think if you look at the IJ's findings and you look at the State Department report, at least in this case, as the IJ put it, what we have is a very unstable country, and we do have a problem of discrimination against ethnic Chinese, and we do have the problem that they suffer some problems in school, and sometimes some of them do have businesses harmed, and there can be riots and turmoil. But I don't think this Court should find that this equals the exceptionally high standard of pattern or practice. This case just simply doesn't warrant that finding. There's no evidence that the government or any group with the government's consent or knowledge is systematically rounding up all Chinese. I mean, the Petitioner's mother. The test? I don't believe that's the test, counsel. But I think that the test is that there's an extraordinarily high probability that the members of the group will be targeted. And I think the analogies the courts have traditionally used are akin to that, that where there's a systematic attempt to round up people or to harm them. I think here what we have is the Petitioner's own mother has lived peacefully in that country her entire life. The Petitioner has three siblings who have lived peacefully in that country. The Petitioner's wife has three siblings as well. I may have the numbers wrong. I'm pretty sure the Petitioner's wife has three or five, I believe. But they each have several siblings who live comfortably in that country. Their daughter has returned and has suffered no more incidents. But she's married to a native Indonesian. But, Your Honor, if the test is that ethnic Chinese or people of mixed Chinese-Indonesian descent are targeted, I'm not sure why that would undercut it, especially given that Petitioner's argument in this case is that his wife is persecuted even though she's native Indonesian because of her marriage. I think, if anything, the Petitioner's argument is that mixed marriages only increase the persecution. So I'm not sure how that would help. Roberts. Counsel, your time has expired. Thank you. And you used up all your time on the --- counsel, you used up all your time on the  So I think we have the case in hand, though. Okay. The case result will be submitted. And we'll proceed to the next case on the oral argument calendar, which is Mumang v. Ashcroft. Thank you.
judges: B. Fletcher, Noonan, Thomas